Next case of this morning is number 18-1862, SIH Partners LL P et al. v. Commissioner of Internal Revenue, Mr. Dupree and Ms. Hagley. Welcome. Good morning. Tom Dupree on behalf of the appellant SIH and I'd like to reserve four minutes for rebuttal. You sure can. May it please the court. The IRS wants to have it both ways in this case. It says that... That was the opening line of your brief, wasn't it? We are consistent, if nothing else, your honor. And it's true because what they are telling this court is that on one hand, we are subject to immediate tax liability because the loan guarantees at issue here were substantially equivalent to a dividend. But then in the next breath, they turn around and say that we are not entitled to the lower tax rate for dividends because these loan guarantees were not substantially equivalent. Isn't the real thing you're concerned about is the tax rate? We're concerned about both, your honor. Our foremost challenge, the first one as we've presented it, is a challenge to the regulations themselves. It's our position. So the statute came out, what, in 62? The regulation is 64? That's correct. And now, 55 years later, you're asking us to say that one doesn't flow from the other because what? For several reasons, your honor. For one thing, it does not track the statute. The IRS went above and beyond... The regulation all but parrots the statute, doesn't it? I disagree with that, your honor. The critical point in this case is the question of valuation. That is to say, how you value these loan guarantees for purposes of determining the amount that was repatriated or invested in the United States. That is not a question that is answered by the statute. In fact, what Congress did when it broke off, Section 956D made it its own separate subsection for which it gave the IRS independent rulemaking authority to implement this. Well, 956D says a controlled foreign corporation shall, under regulations prescribed by the Secretary. So it's saying, go out there and do the regulations. Be considered as holding an obligation of a United States person if such controlled foreign corporation is a pledger or guarantor of such obligations. And then you look at the reg that implements that any obligation of a United States person with respect to which a controlled foreign corporation is a pledger or guarantor will be considered to be held by the controlled foreign corporation. What your honor recited, I agree, largely mirrors it. But the point that we are focused on is the valuation regulation. That's the one that says for purposes of valuing these guarantees, we are going to measure the value of a loan guarantee as basically the unpaid principle of the loan. That is a valuation determination that was not set forth in the statute. The only thing the statute says about valuation is it says you use the adjusted basis in these various types of properties. That's all well and good when you're talking about, say, a loan or real estate or something like that, all of which have adjusted basis. What is our review? Here's the Chevron or is it State Farms Arbitrary and Capricious or what? Well, I think it's both factor in. In other words, we agree that this case is properly analyzed under the Chevron framework. At least our first challenge is properly analyzed under Chevron. The government concedes that this is not a Chevron step one case. So I think they actually are conceding the point that you and I were discussing, namely whether this case is resolved by the plain language of the statute. They say it's Chevron step two and we're in agreement on that and it's our position that what the IRS has done when it implemented this statute in that loan guaranteed evaluation regulation, that was a policy decision made by the IRS not commanded by statute that is fundamentally irrational. It makes no economic sense. It makes no common sense. It makes no economic sense to whom? Well, just as a matter of basic economics, it makes no sense to say that the IRS was told, I guess, I mean, I assume the staff was told to come up with a right-line rule and the IRS responded. There's only I think one comment, right? Received during the rulemaking. There are a few comments during the rulemaking. That's right. I thought it was only one. Again, there were not a robust number of comments. I agree with you. So how can you say if it was Arbitrary and Capricious, that would be, that would be a real big hill to climb, wouldn't it? No, not at all, Your Honor. In other words, there are several different ways that a rule can be Arbitrary and Capricious. One is, regardless of what comments were submitted during the rulemaking process, is if the rule, in substance, is irrational. That's our position. How is it irrational and to whom is it irrational? It is irrational because basic economics, you cannot value the value of a loan guarantee is not the same as the value of the loan itself. In other words, you have a situation, as in this case, where you have multiple guarantors. In this case, you have almost 40 separate guarantors. And under the IRS's regulation, the value of these guarantees would potentially be, you know, 40 times the amount of the loan, which would be about 60 billion dollars. That can't be right. They, in many other contexts, in the transfer pricing context and other contexts, they have all sorts of techniques for valuing loan guarantees. That's commonly done. That's the bread and butter of what this agency does. They don't, didn't do any of that in this case. Instead, they adopted this irrational. I think Judge Greenberg has a question. Let me ask you this, interrupt. Aren't you basing your challenge to the rule largely on the basis of the development of how it was applied? In other words, rather than the record at the time it was adopted a half a century ago, you're now looking at subsequent events. And you can't do that. I think you have to, if you challenge a rule, don't you have to challenge it on the record at the time it was adopted? Judge Greenberg, I think we are challenging it on the basis of the record at the time it was adopted. And what that record reflects is that the agency provided a single conclusory sentence as to why it was doing what it did. That is plainly insufficient under the APA, under the Supreme Court's recent decision in Onseno Motor Cars. What should they have done at the time? They should have, if this is the approach they wanted to take, they should have offered an explanation as to why it could possibly make sense to value loan guarantees in the way that they do. I don't think there is a way they could rationally explain it, but nonetheless, they haven't said a word about that. If you've got 956 D, what are you supposed to do with it in order to put a reg into place? What would you have done different? What they could have done is if they wanted to implement that, they could have said, here's how we are going to value loan guarantees for purposes of 956 D, which says that these are taxable, triggering taxable events. And they could have said that we will value these loan guarantees based on what we do in many other contexts is the economic value of the guarantee. That can be done in several ways. One way you could do it just simply is if you have multiple guarantors, you would assign a pro rata share. Another way you could do it is look at third party transactions when you have an independent third party providing a loan guarantee, you say, what would this basically cost in the free market? And we're going to put that value on it. Once upon a time, I did this stuff. If I were a lender and I were doing this loan and you say to yourself, why is there multiple CFCs guaranteeing? I mean, it kind of seems a little strange, right? Not if you're a lender. You want guarantees from every CFC you can as a condition for extending that loan because CFCs have made their earnings available for use to the US shareholder in order to do this because if there's a problem, I want to get them the entity, the American entity may go chapter 11 and I want to make sure I have as much backup as possible. That's the way it's done. And so is it overkill for a bank to ask for that? Sometimes, sometimes not, but most of the time they just want to be absolutely sure that they're going to get repaid. And Judge Amber, I'm not quarreling with what you just set forth. In fact, in the record, we have declarations, the Greenberg Declaration, the Harley Declaration that set forth precisely why these CFCs were included. And my point is simply that regardless of why they were included in this case, it wasn't because they were actually going to provide collateral. They were simply there because the lender didn't want any of these entities basically moving money to a place where they couldn't reach it. The point is, is that the IRS needs to make a rational valuation of that guarantee. And it's our position that in this case, but just as a general matter, anytime you have, you know, multiple lenders, you could have borrowers of varying degrees of creditworthiness. The value of that guarantee depends. It's on a spectrum. There are some cases where that guarantee might be very valuable because otherwise the borrower wouldn't even be able to get the loan, but for the guarantee. That's not this case. But then there are other cases at the opposite end of the spectrum, which are more analogous to our case, where you have a whole host of co-guarantors, all of whom say we're going to guarantee it. And you can't simply say, well, each of those individual co-guarantors is going to be deemed to have invested the full amount of the loan. Frankly, that's economic insanity. But that is what is in their regulation. And so to get back to your Honor's question about what should they have said, they either should have tried to offer some sort of rational explanation for why they were taking this approach, which as I said, deviates from the way that they normally value loan guarantees. But at a minimum, they could have taken a much more rational approach. They could have said, we're going to do a pro rata approach. We're going to look to third-party transactions to make a meaningful guarantee of what this would cost in the free market. They did none of that. I would submit that if this court says that that one sentence quote-unquote explanation satisfies the APA's reasoned analysis requirement, then that requirement is effectively a nullity. Yeah, look, I want to ask you this. Aren't there other types of property in 956 that are investments? And if you're right, for example, tangible personal, tangible property, stock, intellectual property rights, and other things, or if you're right, wouldn't they all become dividends? Judd Greenberg, if the regulation itself is valid and there are other types of property in 956 C, I think they would be dividends in the sense that they amount to constructive distributions. They are conferring value or a benefit on the shareholder. So for that reason, yes, I think that they would be dividends. I think that our case, certainly these loan guarantees are dividends. But then that would undercut your semantic argument that if it's the dividends for one purpose, it's dividends for another purpose. Because they're not dividends as we understand what a dividend is. Well, Judge Greenberg, I don't think it undercuts our argument. In other words, our argument, we have two arguments, and the first one is that the regulations are invalid. And if we prevail on that, then there's no basis for the government to say that these are 956 inclusions. Do these guarantees meet the definition of a dividend under 316 A? Yes, they do. Because the definition under 316 A basically says that there needs to be a distribution of property that comes out of the earnings of the corporation. These earnings? Well, again, accepting the government's model, these loan guarantees did come out of earnings. I don't know where else they possibly could have come from other than the CFC's earnings. And number two, the statute itself, keep in mind, caps the distribution at the earnings of the corporation. So that's actually the metric that is used to determine how much gets included under the statute. So absolutely, this squarely fits within the definition of a constructive dividend. Even the government's definition of a constructive dividend basically says anytime a corporation confers something of value on the shareholder, that's a constructive dividend. I mean, that's the case. It seems to me that the Supreme Court only uses the notion of a constructive dividend to draw a line between income and non-income, not between two particular tax rates. I think that the government has effectively conceded that the concept of a constructive dividend is fully applicable in this context. In other words, for the meaning of dividend within the qualified dividend income section one, the government and the tax court two has recognized that the government agrees that if something is a constructive dividend, it is entitled to the 15% rate. Do you have any case or ruling that used an income status as a constructive dividend to alter a tax rate for that income? I would have to get back to your Honor on that. As the question is phrased, I'm not aware of that, but I will circle back with your Honor if we can provide a case holding to that effect. Mr. Dupre, I want to ask you a question I should have asked at the outset. I thought I was, but my phone was cut off for talking. You are not on the brief. Which firm are you with? I am with Gibson Dunn. We entered, I entered my appearance a week or so ago, but I am here representing the appellant. Okay, it didn't come to my attention. So you're with Gibson Dunn, okay. I am, your Honor. Okay, Mr. Long was initially on brief. That's correct. Okay, that's correct. That's correct. Is everything okay with him? Everything is fine with him. Yes. Thank you. No, we just, we just added. We just expanded our team. If I could make one additional point, in addition to what we've talked about, we have another problem with what the IRS did here, which is that it deviated from the way that it historically has handled these types of 956 cases. We have cited to this court Revenue Ruling 89-73, and in that Revenue Ruling, the IRS expressly says that in making a determination as to whether something is an inclusion, we are going to analyze the facts and circumstances of the transaction. I don't think there's any dispute that they did not do that here. They applied a categorical rule. They deviated from what they said is the standard they are going to apply without any acknowledgement that they were deviating from it or any explanation. So even if this court were to uphold the regulations, we still think we are entitled to a remand precisely because the IRS deviated from what it has always described as its standard practice of making a facts and circumstances-based assessment, which in this case would leave absolutely no doubt that the value of these loan guarantees was far, far short of a $1.5 billion amount of the loan. Before you sit down, let me ask you, I'll wait to rebuttal to ask you, but the question is going to be, why is the Rodriguez case, which goes against your position, wrong? I'll be ready with an answer. Thank you. Good morning, and may it please the court, Judith Hagley from the Department of Justice, representing the commissioner in this case. I'll first address the income inclusions that the regulations in this case have provided clear guidance to the tax bar for over 50 years. You know, Congress has amended 956 eight times and our major revisions in 76 and 93, but if you look on page 83 of the addendum to our brief, the statute's actually been amended eight times and Congress has never disagreed with the Treasury's treatment of guarantees, the categorical rules that it's adopted, and the categorical rules that Treasury adopted back in 1964 are fully consistent with the language of the statute, fully consistent with its course is by trying to rewrite the statute to read into the statute some sort of valuation test. Value of the CFC investment in U.S. property. I can ask you the same question I asked Mr. Dupree. When we analyze the validity of the regulations, should we do it under Chevron or State Farms Arbitrary and Capricious Review or both? What they've brought up, both challenges, the Chevron review is the substantive challenge. They brought up the procedural challenge, which is under State Farm. But the regulation is both substantively and procedurally valid. It's substantively valid because it's fully consistent with both the language and the purpose of the statute and it's only inconsistent with this test that they're trying to write into the statute that is simply not there. I think one of the arguments that Mr. Dupree is making is that there's so little out there in terms of the regulation other than saying it's in conformity with the statute. I'm gathering that the argument is that that's not enough to show that you brought your independent policy expertise to the table in drafting the regulation. Your response to that? Our response to that is what the APA requires is concise general statement of basis and purpose and the regulations here provided that. There was a new statute that was enacted. The regulations resigned to adapt the regulations to that statute and Treasury exercised its expertise in three basic ways. One, it adopted a general rule and provided examples in the regulation of how that general rule should be implemented and what facts would be relevant. Two, it carved out a regulatory exception for conduit financing and three, it made clear how much should be how much is the investment in property when a CFC guarantees a loan of a U.S. person and it's since the statute says guarantees should be treated as a loan, Treasury said, well, then when it's a guarantee, it's going to be the out-sounding principal amount of a loan, which is the amount of earnings that are made. If you're in the commercial world, if you're a bank, you want as many guarantees as possible, but that doesn't necessarily tell you how you should do the tax treatment. So in the case of guarantees from multiple CFCs, which would theoretically cause a U.S. shareholder to receive income from many sources greater than the actual loan, why didn't the IRS put a cap on this? And in effect, a cap on the amount of aggregate income. Well, Treasury did consider... This is piling on and piling on and piling on. Right, right, right. Well, first of all, let me point out, and I want to address a question that you've asked, how many comments were received in 1963? And there were five comments. Oh, there were five? I thought it was one. There were five commenters. And some of these were major hitters in the tax bar, the ABA, the American Institute of CPAs, the National Foreign Trade Council, and they carefully vetted these regulations and provided detailed comments. But only one comment, and this is from the APA, and this is from the ABA, and this is probably what you're thinking I agree, didn't question the categorical rules or how the amount of the income inclusion was going to be calculated, but merely suggested that the regulatory exception, proposed exception for conduit financing, be expanded, and Treasury responded to that by, in fact, expanding the conduit exception set out in the regulation. Is this kind of income, is this an unusual situation, or are there many cases where income is added by reason of this type of guarantee? I mean... I mean... In other words, is this type of what's going on with CFCs here, is that the usual type of situation? When the CFC guarantees a loan, then there will be an income inclusion, and this is well known by the tax bar. And then what about the question about it, why not a cap on aggregate income? So Treasury, I mean, so I was getting back to the commentators that made the suggestions, no one suggested that there should be a cap, and not having a cap is a reasonable approach because when you're looking at what earnings need to be included in income, when multiple CFCs make their earnings available to a lender, multiple amounts of earnings have been made available and are in use, and the tax deferral privilege should end there. The hypothetical situation of whether those inclusions could exceed the amount of the loan, and I'm referring to this hypothetical because I'm not aware of that ever happening, and it certainly didn't happen in this case. The amount of the income inclusions were far less than the amount of the loan. Treasury did consider whether there should be a cap in 2015. It issued proposed regs saying that they would cap the amount of the CFC inclusions at the amount of the loan. But noted that it had some concerns, administrability, how would you allocate back and forth, you know, the single cap, how would you break that up between the two, and also concerns about abuse because, you know, this area is very detailed, so you make a change in one place and it could have an impact on how CFCs and their U.S. shareholders are claiming foreign tax credits. So the following year when it finalized those proposed regs, it noted that it did not, in fact, adopt a cap and was still considering the issue. But again, this hasn't caused any problems. It did not cause a problem in this case, and it's not even clear that it really would be a problem because as I pointed out, if a lender wants 200 of earnings to guarantee a $100 loan, then $200 of earnings, one from each CFC, is being made available for use by U.S. shareholders, and the deferral privilege is no longer appropriate in that circumstance. Is either of my colleagues, Judge Greenberg or Judge Restrepo, have any further questions on the first issue? No, I just wanted to ask another who's who's question. There's an appearance was added in this case for the government by Jeffrey H. Fenberg, and his address was Royal Palm One Plantation, Florida, and I was startled. Was he a former government attorney or what? No, he still works for the government. He's moved up in the world, is what you're saying. He's a lucky man. No, he was actually the trial counsel in this case. He's with the chief counsel's office of the IRS. And I'm not sure why there's an appearance in the case, but he appeared before the tax court. So perhaps that's why. Well, I see he did, but I was surprised. He was on Plantation, Florida. Usually I don't see that address on a government attorney. He's living well. Turning then to the second issue. Second issue. Must a transaction meet the definition set out in 316a to be a dividend? A constructive dividend could meet the definition set out in 316a because there would be a distribution from corporate property to the shareholder for the benefit of the shareholder. But what's key with dividends, whether they're formally issued or constructively issued, is that there's a diversion of corporate assets. There is a transfer of ownership from the corporation to the shareholder or to a third party. And that's why the Fifth Circuit in Rodriguez says that this, an income inclusion under 956, does not qualify for the preferential rate because there's simply no distribution of earnings. Earnings may be made available for use, but they haven't been distributed, they haven't been diverted, and there's no change in ownership. Under section 956, this is an investment in U.S. property by the CFC. So is the critical component of that a transfer of ownership? That's correct. That's what the Fifth Circuit relied on. That's what the tax covenants are. So here there's no transfer of ownership? There's no, this is still, and it gives the purpose of why the qualified dividend rate was enacted in the first place. It was to encourage corporations not to retain and reinvest their earnings, but to distribute it out to their shareholders. And section 956, the earnings are still held and reinvested by the CFC and not the U.S. shareholder. Now there's been, I came across some criticism by Mr. Low Yoder in an article in 2012 of Rodriguez, claiming that why not have this as a dividend that would be taxed as a dividend rather than ordinary income? What's your response? Did you, are you familiar with the article? No, I'm sorry. I'm not familiar with the article. I don't think it was cited in this case, but I'm not familiar with it. It's not a dividend because it doesn't fit the definition of dividend and it hasn't been deemed by either Congress or Treasury to be a dividend for purposes of section 1H11. When Congress enacted section 1H11 in 2003, it did amend section 306 of the code, which also addresses a different, another type of non-dividend income inclusion there. It's the sale of what's referred to as 3S. Yeah, I guess what the concern is, it's that CFC guarantees are substantially, quote, substantially the equivalent of a dividend, close quote, for purposes of income inclusion under 956D, but they are not substantially the equivalent of a dividend for purposes of the applicable tax rate. That's correct. The applicable tax rate needs an actual dividend. That's the whole point of the tax rate is that the money has been transferred from the corporate shareholder. It's no longer the shareholder from the corporation. It's no longer the corporation's property, but to the shareholder or someone for the shareholder's benefit. Any further questions? Judge Greenberg? No. Okay. Thank you. Thank you very much. The argument on qualified dividends that the government just presented is directly contradicted by what the IRS just said a few weeks ago in their notice of proposed rulemaking, which we attach to our reply brief. In that, they said, quote, and this is talking about the purposes of section 956, and I'm quoting from page 2A of our reply brief, Federal Register, page 55325. They say that chief among the purposes of section 956 is to ensure symmetry between the treatment of actual dividends and payments which are substantially the equivalent of a dividend. Was there a transfer of ownership here? There was not a transfer of ownership in the formal sense. Now, the transfer of ownership concept applies to formal sense. I'm sorry? In the sense of a formal dividend. In other words, a formal dividend involves a transfer of ownership in which the corporation, say, pays $100 cash. This didn't happen here. That did not happen here. We are arguing that this is a constructive dividend, which the government has acknowledged would be covered by section one, and the definition, again, agreed to by the parties of a constructive dividend is when a corporation confers something of value or gives an economic benefit to the corporation. So the constructive dividend doesn't require a transfer of ownership. That's a good argument. If we're talking about whether this was a formal dividend, but when it comes to a constructive dividend, that doesn't matter, and that gets to Judge Ambrose's question about where the Rodriguez court went awry. They simply didn't analyze this correctly under section 316, which defines what is a dividend. The second way that they went awry is that either the Fifth Circuit just didn't miss it, or my assumption is the IRS didn't tell them that the Fifth Circuit said when Congress wants something to be treated like a dividend, it says so expressly. That was the foundational premise of the Fifth Circuit's opinion, and it's wrong. The IRS has many regulations. We've cited them in our brief, where Congress did not specifically say we want dividend treatment for this, but the IRS has issued regulations giving it dividend treatment. So if the Fifth Circuit's approach is correct, that you need an express congressional statement, they've just wiped out all of these IRS regulations that deem things as dividends when in fact Congress has not specified it. If I could address on our initial issue a couple points that came out of your colloquy with my friend. One point is on... They deemed dividend, isn't that something that Congress does? It is something that the Congress does. It's also something that the IRS sometimes does, and I think the purpose is reflected in the NPRM, is to give the same tax treatment to actual dividends and deemed dividends. That's what they say is the purpose of 956, but that is exactly the opposite position that they are urging this court to adopt. Is there a difference in the state of the art between a deemed dividend and a... What was the other word you used? An actual dividend? Constructive dividend, excuse me. Deemed or constructive. I think they're often used interchangeably, a constructive dividend and a deemed dividend. I think deemed would... I mean, I certainly use them interchangeably in ordinary conversation, but it struck me that there might be some difference between the two. I think the difference would be a deemed dividend is something that becomes a dividend because some higher authority has said so, whereas a constructive dividend is something that is inherent in the nature of the thing. So you could have a constructive dividend, even if it has not officially been deemed a dividend by the government. In my world, which was in part bankruptcy, a deemed something was a pretend something. It didn't happen, but we're going to pretend it. Sometimes somebody would say a constructive, whatever it was, was that enough happened so that it would be fit the elements of what would otherwise be whatever it is, in this case, a dividend. And but that would normally be done by a court as opposed to Congress or saying that we're just going to pretend that this is X when we know it's not really X. Usually it's something like a consolidation of bankruptcy, but we won't get into that. So it seemed like there could be a difference between the two, but I sounds like you're just using them interchangeably. I think for purposes of this case, there's not an enormous difference because the one thing the government has said time and again, most recently in the NPRM, is that they want similar treatment regardless of whether it's formal, constructive, deemed, that the substance of the transaction should be taxed at the same rate across the board, regardless of whether it's deemed constructive, actual, it's symmetry, and it's fairness, both of which are absent here. On our first argument, the point I wanted to emphasize is on the APA challenge, and I take your Honor's point of the paucity of comments in the rulemaking process, but keep in mind that an agency's failure to respond to comments during the rulemaking process, that can be an APA violation, but that is separate, distinct, and independent from an agency's general obligation. But if I say that I'm doing a reg that's essentially in conformity with the statute and the reg pretty much parrots the statute, do I really have to say a whole lot more? Well, several points. One, that's not this case. In other words, that's not this case because the statute did not say how to value loan guarantees. That is a construct of the IRS. So the parroting, mirroring argument doesn't carry today. It does say that there's to be regs adopted by the IRS. So I beg your pardon? Didn't 956D say that there are to be regs? It did, and I think that underscores our point that that was the one piece of this statutory scheme that Congress singled out. I mean, to be sure, the IRS has generalized rulemaking power, but in terms of this statutory scheme, note the structure because Congress took out 956D, put loan guarantees and pledges alone in that section, and directed the IRS to issue regulations. So it was calling upon the agency to draw upon its expertise to fashion a valuation mechanism for these loan guarantees. And so simply saying we're just conforming to the statute, I think itself is defiant of congressional intent. The agency is also under an ongoing APA obligation to provide a reasoned explanation for its actions, irrespective of what comments come in during the rulemaking process. This is a standalone obligation. This court recognized it in Manila. The Supreme Court recognized it in Encino Motor Cars. It said the agency has to explain how it's bringing its expertise to bear on the problem. The agency did not do that in this case. Encino Motor Cars also involved an older regulation where the limitations period had run, and the Supreme Court said, what do we do with this? You know, the regs came out a long time ago. And what did they do? They accepted the challenge on the merits and they vacated the rules. So the fact that a rule has been on the books for a while doesn't insulate it from an APA challenge. The agency had to do more. If this court says that one sentence is enough, there's not much left to the APA. If there are no further questions, we ask that the judge review it first. If this court says that a regulation adopted 55 years ago is somehow astray when you've gone back and you've amended the 956 how many times and not really messed around with the regulation. Oh, no, you're asking us to leave with our chin, aren't you? Not at all, Your Honor. And in fact, your point about how Congress has amended it, that was the question that the Supreme Court addressed in the Rapinos case not too long ago. And what they said in Rapinos is they said this argument about congressional acquiescence. That only applies when you have overwhelming evidence that Congress is specifically focused on the provision at issue and approved the agency's treatment. They're not even close to meeting that standard for acquiescence here. 55 years is a long time. It is, but also keep in mind that the Cleveland Browns won a championship. Well, fair enough, fair enough. Then we might be another 50 years. But on that point, I would say I could just do 15 more years of it if I could live that long. On that point, on that point, though, I would say that the reason why this hasn't been litigated or challenged previously, just look at Revenue Ruling 8973. That's the answer. The answer is that when this has come up, they do an individualized facts and circumstances analysis that prevents the sort of The IRS has acknowledged that their regulatory scheme, in their words, produces strange results, which is a big red flag that something is awry here. So for those reasons, we ask this court to vacate the regulations or in the alternative approved dividend treatment of loan guarantees. Thank you very much. Thank you to both counsel for very well presented arguments and we'll.